UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAYRA PAREDES NINO, individually and as wife of decedent Jose Alfredo Yanez Reyes; and JY and RY, minors, by Mayra Paredes Nino, their guardian ad litem,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 13-cv-0469-WQH-BGS<br><br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment (ECF No. 84) filed by Defendant United States of America.

## I. Background

On May 11, 2016, Plaintiffs Mayra Paredes Nino ("Nino"), JY, and RY filed the Third Amended Complaint (the "TAC") (ECF No. 67) against Defendant United States of America. The TAC brings claims for wrongful death and emotional distress stemming from an incident during which Border Patrol Agent Dorian Diaz shot and killed Jesus Alfredo Yañez Reyes ("Yañez") near the border of the United States and Mexico. TAC at ¶¶ 64–73.

On October 16, 2017, the United States filed the Motion for Summary Judgment and Exclusionary Sanctions (ECF No. 84) along with a Separate Statement of Undisputed Facts (ECF No. 84-2). On November 6, 2017, Plaintiffs filed a Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and Motion for Exclusionary Sanctions (ECF No. 87) along with a Response to the Separate Statement of Facts (ECF No. 87-15). On November 13, 2017, the United States filed a Reply Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and Motion for Exclusionary Sanctions. (ECF No. 88).

On March 9, 2018, the Court issued an order (1) excluding the expert reports of David E. Balash and Jack Smith, (2) denying the motion to exclude in all other respects, and (3) ordering the parties to "submit supplemental briefing on whether the United States is entitled to summary judgment based on the evidence in the record in this case." (ECF No. 91 at 7). On March 30, 2018, the United States filed a Supplemental Memorandum of Points and Authorities in Support of the Motion for Summary Judgment. (ECF No. 94). On April 23, 2018, Plaintiffs filed a Memorandum of Points and Authorities in Supplemental Opposition to Defendant's Motion for Summary Judgment (ECF No. 95) along with a second Response to the Separate Statement of Facts (ECF No. 95-1). On April 30, 2018, the United States filed a Reply to Plaintiffs' Supplemental Opposition. (ECF No. 99).

## II. Facts

On June 21, 2011, Yañez and Nino were together with their young son on the south side of a four-lane highway that runs along the Mexican side of the border between the United States and Mexico. Deposition of Mayra Paredes Nino, ECF No. 95-4, at 10–11. Nino was pregnant at the time. *Id.* at 8. Yañez left Nino and their son and headed towards the fence along the border between the United States and Mexico. *Id.* at 10.

Yañez and Jose Ibarra-Murietta ("Murietta") crossed the border into the United States through a hole in the primary border fence. Plaintiffs' Second Response to Separate Statement of Facts in Support of Defendant's Motion for Summary Judgment ("RSSF"),

2

13-cv-0469-WQH-BGS

ECF No. 95-1, at ¶¶ 10, 12, 14, 15.[1] Shortly after 7:00 p.m., Diaz observed Yañez and Murietta hiding in the brush on the United States side of the border. *Id.* at ¶ 14, 15. Due to his belief that the area was dangerous, Diaz radioed for help from Border Patrol Agent Chad Nelson, the closest agent in the area. *Id.* at ¶ 15. Nelson arrived about one minute later. Deposition of Dorian Diaz, ECF No. 84-5, at 11.

Diaz exited his patrol vehicle in order to pursue the Yañez and Murietta. RSSF at ¶ 18. Immediately after Diaz exited his patrol vehicle, Yañez crawled back though the hole in the primary border fence onto the Mexican side of the fence. *Id.* Murietta remained in the United States and started climbing a pole that leads up to a catwalk. *Id.* at ¶ 19. Diaz ran to the top of the catwalk in order to cut Murietta off, while Nelson stayed on the ground. *Id.* at ¶ 20. Diaz's actions caused Murietta to slide back down the pole. *Id.* at ¶ 22.

After Murietta was back on the ground, he ran east along the United States side of the primary border fence. *Id.* at ¶ 26. Nelson chased Murietta and yelled at him in Spanish to stop and give him his hands. *Id.* at ¶ 28. Murietta did not comply with Nelson's commands. *Id.* at ¶ 29. Murietta eventually tripped. *Id.* at ¶ 30. Nelson caught up to Murietta, at which point they engaged in a physical struggle on the ground during which Murietta resisted Nelson's attempt to control him. *Id.* at ¶ 36. This struggle occurred within fifteen feet of the primary border fence. Diaz Depo. at 16.

Yañez reappeared on the south side of the primary border fence near where Nelson and Murietta were struggling and threw one or two rocks at Nelson. *Id.* at ¶¶ 36–38.[2] The rock or rocks were between the size of a golf ball and a softball. *Id.* at ¶ 38. Diaz witnessed

---

[1] Plaintiffs contend that this fact is disputed because Nino states that she never saw Yañez cross the primary border fence. RSSF at ¶ 15. However, Nino stated that she did not observe Yañez for some period of time after he left her because her attention was focused on her crying baby son. Nino Depo. at 10. Nino's statement that she did not observe Yañez cross the fence does not create a genuine issue of fact as to whether Yañez crossed the fence.

[2] Plaintiffs' initial Response to the Separate Statement of Facts (ECF No. 87-15) cites the Deposition of Murietta (ECF No. 87-2). Plaintiffs second Response to the Separate Statement of Facts (ECF No. 95-1) removes all citations to the Deposition of Murietta. In his Deposition, Murietta was asked "Did you at

Yañez throw the rock(s), but could not tell whether the rock(s) hit Nelson or Murietta. *Id.* at ¶¶ 38, 40. Diaz yelled at Yañez in Spanish to get down off of the fence. *Id.* at ¶ 42. Yañez briefly disappeared behind the primary border fence then quickly reappeared and threw a nail-studded wooden table leg at Nelson. *Id.* at ¶¶ 42, 43. The table leg hit Nelson in the head, but delivered "more of a glancing blow [than] an incapacitating one." *Id.* at ¶¶ 43, 44. Diaz witnessed Yañez throw the table leg and the table leg make contact with Nelson's head. *Id.* at ¶ 45. Diaz then drew his firearm and yelled at Yañez to get down off of the fence. *Id.* at ¶ 50. Yañez's eyes lit up upon seeing the gun, and he retreated back down from the primary border fence. *Id.* at ¶ 51

Nelson, meanwhile, continued struggling with Murietta and managed to get one handcuff on Murietta. *Id.* at ¶ 45. Nelson was not able to handcuff Murietta's other hand due to Murietta's continued resistance. *Id.* Diaz approached the struggle and began hitting Murietta in an attempt to get Murietta under control. *Id.* at ¶ 52.

Diaz anticipated that Yañez might reappear on the primary border fence and continue to throw objects. *Id.* at ¶ 58. With Nelson still struggling with Murietta, Diaz walked slightly west in an attempt to surprise Yañez in the event he reappeared on the primary border fence. *Id.* at ¶ 59. Diaz then observed Yañez look over top of the primary border fence. *Id.* at ¶ 61. Yañez was visible from the chest up. *Id.* Yañez cocked his hand back as if to throw something at Nelson, at which point Diaz shot Yañez. *Id.* at ¶ 65.[3] After he

---

any point see Mr. Yañez throw anything?" and answered "No. He would have hit me." (ECF No. 87-2 at 29). The Court finds that Murietta's statement that he did not see Yañez throw anything does not create a genuine dispute of fact as to whether Yañez threw anything. The Court also finds that the fact that any projectiles thrown by Yañez may have hit Murietta instead of Nelson does not create a genuine dispute of fact as to whether Yañez threw any projectiles.

[3] Plaintiffs contend that Diaz "d[id] not state that 'Yañez cocked his hand back to throw another object.[']" In his deposition, Diaz stated
> I move over, and I see Mr. Yanez come back up, maybe from—maybe the chest—chest up, maybe from the nipples up. And I see him cock back as to throw something. He had a fist in his hand, and he goes back to throw something. He's looking down at Nelson. He's looking down at Mr. Murietta to throw something down. As I go to draw my weapon and yell, I just take one shot right at him.

was shot, Yañez's body fell back onto the south side of the primary border fence. *Id.* at ¶ 72. Yañez died from the gunshot wound. Supplemental Declaration of Vincent Di Maio, M.D., ECF No. 84-5, at 274. When Yañez was shot, Nino and her son were standing in Mexico where Yañez had left them. Nino Depo. at 11. Murietta was handcuffed and subdued shortly after Yañez was shot. RSSF at ¶ 74.[4]

## III. Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

---

(ECF No. 84-5 at 18).

[4] Plaintiffs contend that a number of these facts are disputed because,
> according to [Nino's] timeline of events, it would have been near impossible for Yanez to have departed from her position across []the four lane highway[] on the Mexico side of the fence, enter the US, depart the US, taunt the agents through the fence with a table leg, then climb the tree on the Mexico side of the fence with either A) multiple items with which the agents claim Yanez threw at them or B) climb up and down the tree at least twice to gather those items separately, all before she heard gunshots.

RSSF at ¶ 1. However, Nino stated in her deposition that "not even several minutes" elapsed from the time Yañez left Nino until Nino heard gunfire. Nino Depo. at 7. The Court finds that Nino's statement that "not even several minutes" elapsed from the time Yañez left Nino until Nino heard gunfire does not raise any genuine issues of fact concerning the interactions between Diaz, Nelson, Murietta, and Yañez. *Id.*

5

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must designate which specific facts show that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

## IV. Jurisdiction

### A. Wrongful Death

The United States contends that the foreign country exception to the Federal Tort Claims Act (the "FTCA") bars Plaintiffs' wrongful death claims because "Yañez's legs landed on U.S. soil when he died, and his upper body landed on Mexican soil." (ECF No. 94 at 17). Plaintiffs contend that Yañez died when his body was entirely within the United States. (ECF No. 95 at 5). Plaintiffs also contend that, even if Yañez did die with his legs in the United States and his upper body in Mexico, the foreign country exception would not bar Plaintiffs' wrongful death claims. *Id.* at 6.

Under the FTCA,

> the district courts . . . have exclusive jurisdiction of civil actions on claims against the United States . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "Section 1346(b) grants the federal district courts jurisdiction over a certain category of claims for which the United States has waived its sovereign immunity and 'render[ed]' itself liable." *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (citing

*Richards v. United States,* 369 U.S. 1, 6, 82 (1962)). However, the FTCA "limits its waiver of sovereign immunity in a number of ways." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004). In this case, the relevant limitation, known as the foreign country exception, applies to "any claim arising in a foreign country." 28 U.S.C. § 2680(k). The United States Supreme Court has determined that "the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Sosa*, 542 U.S. at 712.

As the Court concluded in its March 16, 2016 Order, for the purposes of determining whether the foreign country exception bars Plaintiffs' claims for emotional distress, the relevant injury was suffered at "the location of Yañez at the time of his death." (ECF No. 61 at 9). Consequently, if Yañez died while his body was entirely in the United States, the foreign country exception would not bar Plaintiffs' wrongful death claims. Conversely, if Yañez died while his body was entirely in Mexico, the foreign country exception would bar Plaintiffs' wrongful death claims. The question currently before the Court is whether the foreign country exception would bar Plaintiffs' wrongful death claims if Yañez died while his body was located partly in the United States and partly in Mexico.

The Court concludes that it would not. The injury at issue in a wrongful death claim is the "loss of a relative." *Horwich v. Superior Court*, 21 Cal. 4th 272, 283 (1999) (citation omitted). That injury is "suffered," as that term is used in *Sosa*, where the relative died. (ECF No. 61 at 9). When a relative dies while his body is partly in the United States and partly in Mexico, the relevant injury is suffered both inside the United States and outside the United States. The Court concludes that, in such a case, the foreign country exception's bar on claims for "any injury suffered in a foreign country" does not bar a wrongful death claim premised on the relative's death. *Sosa*, 542 U.S. at 712 (2004). Accordingly, the Court has jurisdiction over Plaintiffs' wrongful death claims.

**B. Infliction of Emotional Distress**

The United States contends that the foreign country exception bars Plaintiffs' claim for negligent infliction of emotional distress because "[i]t is now undisputed by Plaintiff

Nino herself that neither she nor her children were located on U.S. soil at the time of the shooting or at any time." (ECF No. 94 at 25). Plaintiffs contend that whether or not Plaintiffs "were actually standing on United States soil" at the time of Yañez's death "is irrelevant." (ECF No. 95 at 9).

As the Court concluded in its March 16, 2016 Order, for the purposes of determining whether the foreign country exception bars Plaintiffs' claims for emotional distress, the relevant injury is "Plaintiffs' alleged severe emotional distress resulting from observing Yañez's injury, and occurring at the time of Yañez's injury." (ECF No. 61 at 13–14). In that Order, the Court denied the United States' motion to dismiss Plaintiffs' emotional distress claims after concluding that Plaintiffs had presented "sufficient evidence to support a finding that the foreign country exception does not bar Plaintiffs' emotional distress claim." *Id.* at 15. The evidence that the Court found supported that conclusion included Nino's statement that she and her son "were always against the border fence at the time [they] witnessed the killing" and an expert report stating that the relevant portion of the primary border fence is located approximately two feet into the United States. *Id.* at 14–15 (citing ECF No. 48-1 at 2–3).

At her deposition, Nino stated that she and her son were actually standing in Mexico when Yañez was shot. Nino Depo. at 11 ("Q. And [when you heard gunfire] you were still standing on the other side of the freeway or highway farthest from the fence? A. Yes."). Plaintiffs no longer dispute that they were located in Mexico at the time of Yañez's death. *See* ECF No. 95 at 8–9 (acknowledging "the fact that Plaintiff Nino was on the Mexican side of the border with her two children" at the time of Yañez's death). Consequently, the relevant injury for the purposes of the foreign country exception—Plaintiffs' alleged distress resulting from perceiving Yañez's death—was suffered in Mexico, and the foreign country exception bars Plaintiffs' emotional distress claims. *See Sosa*, 542 U.S. at 712.

## V. Wrongful Death

The United States contends that the Plaintiffs' wrongful death claims fail because Diaz's actions were not negligent. (ECF No. 94 at 26). Plaintiffs contend that Diaz's

actions were negligent. *See* ECF No. 95 at 7 ("The testimony of Murietta, the officers and [Nino] can establish the unreasonableness of the killing.").

### A. Applicable Law

The elements of a wrongful death claim "include (1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.'" *Norgart v. Upjohn Co.*, 981 P.2d 79, 93 (Cal. 1999) (quoting Cal. Code Civ. Proc. § 377.90) (alterations in original). For wrongful death claims based on alleged uses of force by law enforcement officers, the relevant wrongful act is the officer's alleged failure to act with reasonable care. *Hernandez v. City of Pomona*, 207 P.3d 506, 515 (Cal. 2009). Courts decide whether a law enforcement officer failed to act with reasonable care by applying the standard for determining whether an officer used excessive force in violation the Fourth Amendment of the United States Constitution. *Id.* at 515–517.

The Fourth Amendment permits law enforcement officers to use force "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether [the suspect wa]s actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011). "[T]he 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). When reviewing a motion for summary judgment concerning a law enforcement officer's use of deadly force, the key issue is whether a reasonable jury would necessarily find that the law enforcement officer

reasonably perceived an immediate threat of death or serious physical injury at the time he or she used deadly force. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Officers need not employ the least intrusive means available so long as they act within the range of reasonable conduct. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

**B. Discussion**

The Court must determine whether, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Diaz did not reasonably "perceive[] an immediate threat of death or serious physical injury at the time he shot [Yañez]" *Gonzalez*, 747 F.3d at 794. In reviewing the undisputed facts in the light most favorable to Plaintiffs, the Court must "take the perspective of an officer on the scene without the benefit of 20/20 hindsight[.]" *Id.* This inquiry "requires [the Court] to consider exactly what was happening when the shot was fired." *Id.*

In this case, Diaz observed Yañez and Murietta on the north side of the primary border fence. RSSF at ¶¶ 14, 15. After Diaz exited his patrol car to pursue Yañez and Murietta, Yañez retreated back to the Mexican side of the primary border fence. *Id.* at ¶ 18; *see S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1011 (9th Cir. 2017) (court may consider "whether the suspect actively resisted arrest" in assessing reasonableness) (citing *Graham*, 490 U.S. at 396). Diaz observed Yañez significantly interfere with Nelson's attempts to apprehend Murietta, first by attempting to strike Nelson with a nail-studded wooden board, then by throwing at least one rock and a nail-studded wooden table leg at Nelson from the top of the primary border fence. *Id.* at ¶¶ 24, 36–38, 42–43. Just before Diaz fatally shot Yañez, Yañez reappeared at the top of the primary border fence and cocked back to throw

another object at Agent Nelson. *Id.* at ¶¶ 61, 65. At this point in time, Diaz reasonably perceived an immediate threat of serious injury to Nelson. Diaz had no reasonably practicable alternative methods of capturing or subduing Yañez. *See Glenn*, 673 F.3d at 876 (stating that the existence of "'clear, reasonable and less intrusive alternatives' to the force employed . . . 'militate[s] against finding [the] use of force reasonable.'") (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)); *see also Gonzalez*, 747 F.3d at 794.

In light of these facts, the Court finds that the United States has carried its initial burden of demonstrating that summary judgment is proper. Accordingly, to avoid summary judgment, Plaintiffs must to provide admissible evidence showing that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The Court finds that Plaintiffs have not provided admissible evidence from which a reasonable jury could find that Diaz did not reasonably perceive an immediate threat of death or serious physical injury at the time he used deadly force. *Gonzalez*, 747 F.3d at 794. Consequently, Plaintiffs have not carried their burden and the United States is entitled to summary judgment on Plaintiffs' claims for wrongful death.

## VI. Conclusion

The Motion for Summary Judgment (ECF No. 84) is GRANTED. The Clerk of the Court shall enter judgment in favor of the United States and against the Plaintiffs as to all claims in this action.

Dated: August 13, 2018

Hon. William Q. Hayes
United States District Court